[Cite as *In re J.J.*, 2018-Ohio-3915.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
SANDUSKY COUNTY


In re J.J. and B.J.                                    Court of Appeals No. S-18-009

                                                       Trial Court No.  21630062
                                                                        21730217



                                                       **DECISION AND JUDGMENT**

                                                       Decided:  September 27, 2018


* * * * *

{¶ 1} This matter is before the court on the September 20, 2018 motion of appellant, A.C., for reconsideration of our decision in *In re J.J.*, 6th Dist. No. S-18-009, 2018-Ohio-3819.  Appellee, Sandusky County Department of Job and Family Services, filed a response, and did not object to the requested relief.  We find the motion well-taken.

{¶ 2} Appellant claims her appeal as to B.J. was dismissed in error.  Appellant observes on March 27, 2018, we dismissed B.J.'s case (case No. 21730217) stating a single notice of appeal was filed for both trial court cases, *In re J.J.*, case No. 21630062,

and *In re B.J.*, case No. 21730217. However, appellant argues a second notice of appeal was then filed as to B.J., but was not properly docketed. Thus, appellant requests we reconsider our dismissal of the appeal as to B.J., and issue a decision regarding B.J. as expeditiously as possible.

{¶ 3} The standard applied to a motion for reconsideration, timely filed pursuant to App.R. 26, is set forth in *Matthews v. Matthews*, 5 Ohio App.3d 140, 143, 450 N.E.2d 278 (10th Dist.1981):

> The test generally applied [upon the filing of a motion for reconsideration in the court of appeals] is whether the motion for reconsideration calls to the attention of the court an obvious error in its decision or raises an issue for our consideration that was either not considered at all or was not fully considered by us [the court] when it should have been.

{¶ 4} Here, upon review of the record and our decision, we find, in accordance with *Matthews*, that appellant has brought to our attention an issue which was not considered. We therefore grant appellant's motion for reconsideration, and issue the following revised decision regarding B.J.

MOTION GRANTED:

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
SANDUSKY COUNTY

In re J.J. and B.J.

Court of Appeals No. S-18-009

Trial Court No. 21630062
                21730217

**DECISION AND JUDGMENT**

Decided: September 27, 2018

* * * * *

Angelina Wagner, for appellant.

Dean E. Ross, for appellee.

* * * * *

**SINGER, J.**

{¶ 5} This is an appeal from the March 8, 2018 judgment of the Sandusky County Court of Common Pleas, Juvenile Division, terminating the parental rights of appellant, A.C., the mother of J.J. and B.J., and granting permanent custody of the children to appellee, Sandusky County Department of Job and Family Services ("appellee" or "agency"). For the reasons that follow, we affirm the judgment.

{¶ 6} Appellant set forth one assignment of error:

3.

1. The granting of Permanent Custody in regards to Mother, [A.C.], was against the manifest weight of the evidence.

## Background

{¶ 7} Appellant is the biological mother of four children. Appellant's two youngest children, J.J., born in April 2016, and B.J., born in September 2017, are the subject of the permanent custody award in this appeal ("the children"). J.J., Sr. is the biological father of the children ("father"). Father voluntarily relinquished his parental rights to the children and is not a party to this appeal.

{¶ 8} Appellant met father on the internet, and she traveled from the Columbus area to Fremont to meet father. At the time, father was a convicted felon and Tier I sex offender who was on community control. Thereafter, appellant became pregnant with J.J.

{¶ 9} Appellee became involved with appellant the day after J.J. was born. Appellee received a referral that appellant was homeless, unable to care for J.J., and in the past, appellant's other children had been removed from her care. The next day, Meagan Myers, an investigator for appellee, met with appellant who reported she and J.J. would be living with T.W.

{¶ 10} Three days later, Investigator Myers conducted a home visit at T.W.'s apartment and raised concerns with appellant regarding father due to his mental disability and angry outbursts as well as his threat to remove J.J. from appellant's care. A week later, Myers conducted another home visit and T.W. raised concerns regarding appellant having contact with father and lying about it. T.W. also said appellant was on the phone so much with father that it interfered with appellant's ability to care for J.J. In addition,

4.

appellant had been disrespectful to T.W. Myers was concerned with appellant's cognitive reasoning in caring for J.J. and her ability to protect J.J.

{¶ 11} Four days later, appellee was notified that appellant and J.J. were no longer able to live with T.W. due to appellant's continued lack of respect towards T.W., appellant's arguing and fighting, and continued contact with father. That day, Gabrielle Henry, an ongoing caseworker for appellee, sought and was granted an ex parte order for temporary custody of J.J.

{¶ 12} On April 25, 2016, appellee filed a complaint in dependency and neglect. A shelter care hearing was held that day, and the magistrate found J.J. to be a dependent and neglected child. The magistrate ordered interim temporary custody of J.J. with appellee should continue.

{¶ 13} On July 27, 2016, father was arrested for and charged with domestic violence, a first-degree misdemeanor. Father was accused of holding appellant down on the couch, choking her and threatening to slash her throat. The next day, a notice of probation violation was filed with respect to father's arrest for domestic violence.

{¶ 14} In August 2016, father pled no contest to an amended charge of domestic menacing, a second-degree misdemeanor, and was sentenced to jail and placed on three years of probation. As a condition of his probation, father was ordered to have no contact with appellant. Due to his probation violation, father's community control was revoked and he was ordered to serve time in jail.

{¶ 15} On February 28, 2017, appellant was charged with menacing, a first-degree misdemeanor, for threatening to hit a caseworker during a supervised visit with J.J. at

appellant's home. Appellant subsequently pled no contest to an amended charge of menacing, a fourth-degree misdemeanor, and was sentenced to 12 months of probation.

{¶ 16} On March 14, 2017, a report of a probation violation was filed with respect to father. Despite the no-contact order, father had contact with appellant in December 2016, which resulted in appellant becoming pregnant.

{¶ 17} In September 2017, appellant gave birth to B.J., and the next day appellee filed a request for an order of emergency temporary custody; the order was granted.

{¶ 18} On September 25, 2017, a complaint in dependency was filed regarding B.J. That same day, a shelter care hearing was held and appellee was awarded interim temporary custody of B.J.

{¶ 19} On November 8, 2017, appellee moved for permanent custody of J.J., and on January 12, 2018, appellee moved for permanent custody of B.J. On January 31, 2018, a permanent custody hearing regarding both children was held.

{¶ 20} On March 8, 2018, the juvenile court issued its findings of fact, conclusions of law and judgment entry, and granted permanent custody of J.J. and B.J. to appellee. Appellant appealed.

### The Hearing

{¶ 21} Appellee called numerous witnesses at the January 30, 2018 hearing, including father's grandmother, agency workers and the Court Appointed Special Advocate/ guardian ad litem ("CASA/GAL"). Appellant did not testify nor did she call any witnesses to testify. The relevant testimony is summarized below.

6.

**Grandmother**

{¶ 22} Father's grandmother testified to the following. Father is 32 years old and grandmother is his legal guardian. Father has lived with grandmother his whole life. Father has ADHD, is bipolar, cannot read and has trouble writing.

{¶ 23} Grandmother met appellant sometime before J.J. was born. The police banged on grandmother's door one morning and appellant was with the police. Appellant had been in the basement of the apartment complex where grandmother and father lived, and the police wanted to know why father "went and got her." Grandmother informed the police father did not get appellant because father was on house arrest, could not drive and does not have a car. Appellant wanted to stay, as it was cold outside, but the police said she could not stay. The police took appellant to the police station then sent her back home.

{¶ 24} Grandmother said the basement of the apartment complex where appellant had stayed was horrible - it was unfinished, nasty, dirty and there was no bathroom.

{¶ 25} The next time grandmother saw appellant, father was still under house arrest and appellant was outside of the apartment complex. Father said appellant was his girlfriend and he wanted her to stay, but grandmother told appellant she had to leave or grandmother would call the police; appellant left.

{¶ 26} Grandmother saw appellant again about two or three months later; appellant was pregnant. Grandmother found out appellant and father had been in the basement "and let nature take its course." Grandmother did not believe it was father's

7.

baby, but it was. Grandmother testified she did not know appellant, but was not fond of her because appellant would not let them see J.J. when he was born.

{¶ 27} Father was charged with domestic menacing with respect to appellant. Appellant never lived with father and grandmother. Although there was a no-contact order barring contact between appellant and father, appellant became pregnant with B.J. by father.

{¶ 28} Appellant called the grandmother about two weeks before the hearing and said father still comes over to appellant's house and they have sex. Appellant then hung up.

{¶ 29} Grandmother testified she can hear appellant and father on the phone for hours fighting and making up. Appellant bought father two phones and she pays the phone bill. Grandmother does not think it would be safe for appellant and father to be together, as father is bipolar and flies off the handle in an instant.

## Investigator

{¶ 30} Meagan Myers, investigative supervisor and keeper of the records for appellee, testified the agency opened a dependency investigation in April 2016, regarding appellant's ability to care for J.J. Appellee had received four calls regarding appellant, including two calls stating appellant was pregnant, one call stating appellant came to Sandusky County "to run from the agency" in Fairfield County, and another call stating appellant had mental health problems and father was disabled.

8.

## Supervisor

{¶ 31} Linda Ackerman, a supervisor for appellee, testified she is the supervisor of two current employee who work with appellant, and she supervised two former employees who had worked with appellant. Ackerman stated appellant has had supervised visitation with J.J. for two hours, twice a week, since April 2016. Initially, the visits occurred at the agency's visitation room, then some visits were moved to appellant's apartment. However, there was an incident with a former agency worker where appellant became upset and threatened the worker. Thereafter, appellant was put on "high-risk visit" and all visits took place at the agency's visitation room. Visits were also monitored on a video screen due to the instability of appellant's behaviors. After B.J. was born, B.J. was added to the supervised visits.

{¶ 32} Ackerman observed appellant attended all scheduled visits but made little to no parenting progress since April 2016, despite completing parenting classes. Appellant needed cueing during visits by workers, who offered advice or instruction. In addition, appellant often became overwhelmed and distracted when caring for both children during the two hour visits. Ackerman opined appellant is not able to independently provide care for her children as she seeks constant assistance from workers during visits. Ackerman classified appellant's actions as "attention-seeking type behaviors."

{¶ 33} Ackerman testified appellant has not been able to progress out of the agency's visitation room because Ackerman cannot trust that appellant will have good

9.

judgment with the children and keep them safe. Ackerman stated most people are able to move out of the visitation room and into the community within three months.

{¶ 34} Ackerman noted appellant did not follow the protection order with respect to father, who was violent with appellant, and if appellant is still in a relationship with father, "that is a completely unsafe situation."

{¶ 35} Ackerman acknowledged that appellant loves her children very much and cares deeply for them, but appellant does not make good choices. Ackerman observed that appellant could parent the children if someone lived with her to cue her and remind her what she should and should not do, so that the basic needs of the children could be met.

### Help Me Grow Worker

{¶ 36} Rachel Calvillo, a home visitor employed by Help Me Grow, testified she received a referral regarding J.J. when he was about six days old. Help Me Grow is a voluntary program which provides assistance with and information about development, parenting and family support. Appellant self-referred for services for B.J. following B.J.'s birth.

{¶ 37} Calvillo testified appellant told her she had two other children who were not in her care, and appellant was involved with Help Me Grow with her other children. Appellant's oldest child was with a family member and the daughter was in an adoptive placement after appellant consented to permanent custody.

{¶ 38} Calvillo had discussions with appellant regarding safety issues in the home environment and how issues change as children get older. She also had talks with

10.

appellant about safety with respect to who you choose to have around your children. Appellant had partners in the past who were sex offenders or were violent with her but she continued to have contact with them. Calvillo had conversations with appellant as to why those relationships would be detrimental to her children and why it was important to make positive choices and discontinue contact.

{¶ 39} Calvillo was not surprised that appellant was still together with father because the entire time Calvillo and appellant talked about that relationship not being positive, appellant continued to see father and became pregnant. Calvillo testified appellant does not have a support system so she turns to father or his family.

{¶ 40} Calvillo would generally see appellant and the children every two weeks and appellant was really good at attending visits or calling to reschedule if she had to cancel a visit. During visits, appellant actively participated with her children and appropriately applied the activities Calvillo taught her. Calvillo noticed it was tough for appellant to balance the visits now with two children, and appellant would sometimes get frustrated. Calvillo noted appellant needs cues and help with adjusting activities for the next area of development as the children get older. Calvillo opined if the children were in appellant's home, appellant would do best having regular support with her to give reminders and cues. Calvillo did not know of anyone who could help out appellant.

{¶ 41} Calvillo testified appellant did not put her own needs aside and her children's needs first when picking men. While appellant loves the children and is bonded with them, she has a pattern of unhealthy relationships which is a safety concern for the children. Appellant attended and was successfully discharged from counseling, but still made the

11.

choice to continue to see father. Appellant would benefit from more counseling because she has had trauma, stress and loss in her life.

{¶ 42} Calvillo observed that appellant has a routine when visiting the children, and adjusting that routine or skipping a step would be difficult for appellant. Since children are always changing, it is a concern that appellant is not capable of adapting.

### Caseworker

{¶ 43} Gabrielle Henry, the ongoing caseworker, testified to the following. She is appellant's current caseworker and was assigned to work with appellant in April of 2016. At that time, only J.J. was born. A case plan was put in place which included: a therapeutic assessment, and to follow all recommendations; housing; parenting and relationship. Appellant completed the parenting services, attended counseling, found a place to live and visited regularly with the children at the agency. In addition, after working with a job coach, appellant received her STNA (State Tested Nursing Assistant) certificate and held a job for about three or four months.

{¶ 44} Henry was aware that appellant does not have custody of her two older children, and one has disabilities. Appellant was diagnosed with bipolar, borderline personality disorder, borderline intelligence, posttraumatic stress disorder ("PTSD") and anxiety.

{¶ 45} Despite attending counseling, appellant still has a temper and anger issues, and had an altercation with an agency worker in early 2017. Appellant also became angry with Henry regarding the no-contact order, and yelled at Henry. Another time,

12.

appellant got mad and "flipped off" Henry instead of dealing with the problem and talking it out.

{¶ 46} Henry was told that when appellant first met father and was staying in the basement, appellant called her ex-boyfriend, R., and asked him about the situation. R. told appellant to get out as she could get raped, but she ignored the advice. Appellant told Henry she got "the little scary tummy feeling" when in the basement, but did not listen. Appellant learned what red flags are, but she does not listen to them.

{¶ 47} Henry recalled in September 2016, appellant went to Columbus and was unable to return to Fremont because someone had stolen all of her money, $600, and appellant had not purchased a roundtrip ticket. Henry stated this was an example of appellant not preparing or following through.

{¶ 48} When appellant became pregnant with B.J., appellant said the baby was not father's child because she did not want father to go to jail for violating the no-contact order. Henry stated there was confusion about whether appellant was supposed to be on bed rest while pregnant with B.J. Appellant told Henry she quit her job, in April 2017, because the doctors said she needed to be on bed rest, but appellant walked to court and the farmers' market. Henry reviewed the records and found no mention of bed rest.

{¶ 49} Henry noted appellant has purchased two phones and a pair of boots for father. While appellant was in the hospital to give birth to B.J., father was calling her and asking her for $300 to buy a scooter.

13.

**{¶ 50}** Henry was not surprised that appellant was still with father and having sex with him because she loves him and is not ready to give him up. Henry had heard that appellant may be pregnant again.

**{¶ 51}** Henry testified appellant can only apply the skills she learned for a minute. Henry said appellant is a reactor and has difficultly transitioning. Appellant knows she picks bad men, but continues to do it. Henry opined appellant makes the same unhealthy decisions for her and her family, and because of this, cannot keep her children safe.

**{¶ 52}** Henry stated J.J. and B.J. are in the same foster home and the foster parents are very open to adopting the children if the court grants permanent custody to appellee.

### CASA/GAL

**{¶ 53}** Kay Yeagle testified she was the CASA/GAL appointed to represent J.J. and B.J. Yeagle authored a report and recommendation, which was filed on January 23, 2018, in which she set forth her concerns and recommendations regarding custody of J.J. and B.J.

**{¶ 54}** According to Yeagle's report, she was appointed to represent J.J. in May 2016, and B.J. in September 2017. Yeagle undertook an independent investigation to determine J.J. and B.J.'s best interests. Yeagle observed the children at their foster home, talked to the foster mother, spoke with Caseworker Henry, watched appellant's visits with J.J. and B.J. and reviewed documents like the complaint, police reports, case plans and agency records.

**{¶ 55}** In her report, Yeagle's concerns regarding appellant included that appellant does not have the knowledge, skills and emotional maturity to cope with the children outside of a structured, supervised two hour visit and appellant does not have the skills and

14.

ability to make decisions in the best interest of the children. As a result, Yeager recommended that permanent custody of J.J. and B.J. be awarded to appellee for purposes of adoption, as J.J has been in foster care for 20 months and deserves stability and permanency, and B.J has been in foster care since she was four days old and deserves stability and permanency. Yeagle testified her recommendations are in the children's best interests.

## Juvenile Court's Decision

{¶ 56} On March 8, 2018, the juvenile court issued its findings of fact, conclusions of law and judgment entry in which it granted permanent custody of J.J. and B.J. to appellee. The court made the following specific findings, by clear and convincing evidence, with respect to appellant: J.J. and B.J. were each, separately adjudicated dependent; appellant had two other children removed from her care - one child was placed with relatives, the other child was placed in the permanent custody of another county; appellant has issues with anxiety, PTSD, borderline personality disorder and bi-polar disorder; due to appellant's on-going problems with decision-making, she puts J.J. and B.J. in jeopardy; appellant has failed to adequately and appropriately demonstrate her ability to implement the skills necessary to keep J.J. and B.J. safe; and, appellee offered appellant numerous resources to assist in having the children returned, including: case management and case planning; counseling; Help Me Grow; parent aide; parent education; transportation and, visitation services.

{¶ 57} The court also made the following generalized findings: neither child could be placed with appellant within a reasonable time and should not be placed with

15.

appellant; despite reasonable case planning and diligent efforts by appellee to assist appellant to remedy the problems which caused the children to be placed outside of the home, appellant continuously and repeatedly failed to remedy those problems; appellant, through her actions or inactions, is unable to adequately and appropriately provide food, clothing, shelter and other basic necessities for the children, and/or is unable to prevent the children from suffering physical, emotional or mental abuse or neglect; both children have made progress in their current placements and have responded very well to the stable and consistent environment; the children need a legally secure placement; and, appellee has made reasonable efforts to return the children to appellant.

{¶ 58} The juvenile court specifically concluded that J.J. has been in the temporary custody of appellee for 12 or more months of a consecutive 22 month period.

{¶ 59} The juvenile court comprehensively and generally concluded: neither J.J. nor B.J. could be placed with appellant within a reasonable time, and should not be placed with appellant; the permanent placement of J.J. and B.J. in appellee's custody is clearly in each child's best interest; appellee made reasonable efforts for J.J. and B.J. to return home, which efforts were unsuccessful; and, appellee made reasonable efforts to establish a permanency plan for J.J. and B.J. for the children's placement in appellee's permanent custody with the goal of finding an adoptive family/home for the children.

### The Appeal
### Standard - Permanent Custody

{¶ 60} A juvenile court's decision in a permanent custody case will not be reversed on appeal unless it is against the manifest weight of the evidence. *In re A.H.*, 6th Dist.

16.

Lucas No. L-11-1057, 2011-Ohio-4857, ¶ 11, citing *In re Andy-Jones*, 10th Dist. Franklin Nos. 03AP-1167 and 03AP-1231, 2004-Ohio-3312, ¶ 28. "The underlying rationale of giving deference to the findings of the juvenile court rests with the knowledge that the juvenile judge is best able to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony." *Seasons Coal Co. v. Cleveland*, 10 Ohio St.3d 77, 80, 461 N.E.2d 1273 (1984). Furthermore, "[e]very reasonable presumption must be made in favor of the judgment and the findings of facts [of the juvenile court]." *Karches v. Cincinnati*, 38 Ohio St.3d 12, 19, 526 N.E.2d 1350 (1988). Therefore, a judgment supported by some competent, credible evidence going to all essential elements of the case is not against the manifest weight of the evidence. *Id.*; *C.E. Morris Co. v. Foley Constr. Co.*, 54 Ohio St.2d 279, 376 N.E.2d 578 (1978), syllabus.

{¶ 61} The juvenile court may grant permanent custody of a child to a children services agency if the court finds, by clear and convincing evidence: (1) the existence of at least one of the four factors set forth in R.C. 2151.414(B)(1)(a) through (d), and (2) the child's best interest is served by granting permanent custody to the agency. *In re M.B.*, 10th Dist. Franklin No. 04AP755, 2005-Ohio-986, ¶ 6; R.C. 2151.353(A)(4).

{¶ 62} R.C. 2151.414(B)(1)(a) provides that "the child cannot be placed with either parent within a reasonable period of time or should not be placed with either parent." R.C. 2151.414(E) requires a juvenile court to find that a child cannot be placed with either of the child's parents within a reasonable time or should not be placed with either parent if any one of sixteen factors are met. R.C. 2151.414(E)(1) - (16).

17.

**{¶ 63}** To satisfy the best interest prong of the permanent custody test, appellee was required to establish, by clear and convincing evidence, that permanent custody to the agency is in the best interest of the children based on an analysis under R.C. 2151.414(D). The juvenile court must consider all relevant factors, including: the interaction and interrelationship of the children with their parents, siblings, relatives, foster caregivers and out-of-home providers; the wishes of the children; the custodial history of the children; and, the children's need for permanence.

**{¶ 64}** Clear and convincing evidence requires proof which "produce[s] in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established." *Cross v. Ledford*, 161 Ohio St. 469, 120 N.E.2d 118 (1954), paragraph three of the syllabus. In order to determine whether a juvenile court based its judgment on clear and convincing evidence, the reviewing court examines the record to decide whether the trier of fact had sufficient evidence before it to satisfy the appropriate degree of proof. *State v. Schiebel*, 55 Ohio St.3d 71, 74, 564 N.E.2d 54 (1990).

### Appellant's Assignment of Error

**{¶ 65}** Appellant argues the juvenile court's granting of permanent custody to appellee was against the manifest weight of the evidence. Appellant notes the court found, pursuant to R.C. 2151.414(E), the children could be placed with her or should not be placed with her. In support, the court found appellant had "issues" with PTSD, anxiety and other mental health issues, but no experts testified at the hearing and no psychological reports were admitted. Appellant observes the only testimony as to her mental health diagnoses was provided by the caseworker.

18.

{¶ 66} Appellant contends, due to the lack of evidence regarding her mental health "issues," the court's conclusion that these issues prevented her from parenting was not supported by clear and convincing evidence. Likewise, appellant claims no evidence was presented regarding the nature and extent of her cognitive difficulties, thus there was no clear and convincing evidence that her cognitive deficiencies prevented her from parenting.

{¶ 67} Appellee counters the juvenile court considered the totality of the circumstances and conducted a review of all of the evidence and files. Appellee contends by reviewing stipulated exhibits and the testimony of the witnesses, it is evident there is ample clear and convincing evidence to support the juvenile court's finding that permanent custody to appellee was in the children's best interest. Appellee claims the relevant factors here include R.C. 2151.414(E)(1), (4), (14) and (16). Appellee submits the court based its decision of many factors and the record is replete with evidence supporting the court's position without considering appellant's mental health.

{¶ 68} The record shows the juvenile court concluded that J.J. has been in appellee's temporary custody for more than 12 months of a consecutive 22-month period. *See* R.C. 2151.414(B)(1)(d). The record supports this conclusion. The court further concluded that the children could not be returned to appellant within a reasonable time because appellant did not remedy the conditions causing the children's removal from the home. *See* R.C. 2151.414(B)(1)(a) and R.C. 2151.414(E)(1), respectively. In making such a decision, R.C. 2151.414(E) requires the juvenile court to consider all of the relevant evidence, and outlines factors the court shall consider. If the court finds, by

19.

clear and convincing evidence, the existence of any one of the factors, "the court shall enter a finding that the child cannot be placed * * * should not be placed with [the] parent.

{¶ 69} R.C. 2151.414(E)(1) provides:

Following the placement of the child outside the child's home and notwithstanding reasonable case planning and diligent efforts by the agency to assist the parents to remedy the problems that initially caused the child to be placed outside the home, the parent has failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the child's home. In determining whether the parents have substantially remedied those conditions, the court shall consider parental utilization of medical, psychiatric, psychological, and other social and rehabilitative services and material resources that were made available to the parents for the purpose of changing parental conduct to allow them to resume and maintain parental duties.

{¶ 70} A review of the record reveals that despite participating in case plan services, counseling and parenting programs, appellant failed to adequately and appropriately demonstrate her ability to implement the skills necessary to care for J.J. and B.J., anticipate and address their developmental needs, and keep them safe. The issues which caused the children to be removed from appellant's home included her problems with decision-making, her challenges caring for the children and her relationship with father, and all of these issues persist.

20.

**{¶ 71}** We find the juvenile court's conclusion that appellant failed to remedy the conditions which caused J.J. and B.J. to be placed outside of the home is supported by clear and convincing evidence in the record. *See* R.C. 2151.414(E)(1). We further find the juvenile court properly concluded J.J. and B.J. cannot and should not be placed with appellant. *See* R.C. 2151.414(B)(1)(a).

**{¶ 72}** Turning to the second prong of the permanent custody analysis, the best interest of the children, the record shows J.J. had been in his foster home for a year and a half, almost his entire life, when appellee moved for permanent custody. B.J. had been in the same foster home as her brother for four months, her whole life, when appellee moved for permanent custody. The children were doing very well in their foster home and the foster parents were very interested in adopting the children. Given the children's young ages, they were not able to express their wishes. The record further shows the interaction of the children and appellant during the supervised visitations was mostly appropriate, however appellant needed help and assistance from others several times during each visit.

**{¶ 73}** Upon review, the juvenile court considered J.J. and B.J.'s need for a legally secure permanent placement, and recognized an award of permanent custody would facilitate an adoptive placement. The court noted the CASA/GAL, following an investigation, opined that permanent custody was in the children's best interest. Likewise, caseworker Henry recommended permanent custody as being in the children's best interest.

21.

{¶ 74} The juvenile court acknowledged appellant's love for J.J. and B.J., but found appellant cannot independently care for the children and keep them safe. The court also found J.J. and B.J. are in need of a legally secure placement, but appellant is unable to provide a permanent home for the children.

{¶ 75} Based on the foregoing, we find the juvenile court had before it clear and convincing evidence that granting permanent custody of J.J. and B.J. to appellee was in the children's best interest. We further find the juvenile court's decision to grant permanent custody of J.J. and B.J. to appellee is supported by competent, credible evidence and is not against the manifest weight of the evidence. Accordingly, appellant's assignment of error is found not-well taken.

{¶ 76} On consideration whereof, the judgment of the Sandusky County Court of Common Pleas, Juvenile Division, is affirmed. Appellant is ordered to pay the court costs of this appeal pursuant to App.R. 24.

Judgment affirmed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Arlene Singer, J.                       _____
                                                       JUDGE
Thomas J. Osowik, J.

                                       _____
James D. Jensen, J.                                         JUDGE
CONCUR.

                                       _____
                                                         JUDGE

22.

This decision is subject to further editing by the Supreme Court of Ohio's Reporter of Decisions.  Parties interested in viewing the final reported version are advised to visit the Ohio Supreme Court's web site at: http://www.supremecourt.ohio.gov/ROD/docs/.